Timothy STROTHER, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–4827, A–4857.

Court of Appeals of Alaska.

March 3, 1995.

Hearing Denied June 2, 1995.

---

Jacalyn L. Bachlet, Asst. Public Defender, Palmer, and John B. Salemi, Public Defender, Anchorage, for appellant.

Eric A. Johnson, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Timothy Strother appeals his conviction for first-degree custodial interference, AS 11.41.320(a). We affirm.

On May 11, 1992, at an ex parte hearing, Evangeline Strother obtained a 20-day do-mestic violence restraining order against her husband Timothy Strother. *See* AS 25.35.020. (Ms. Strother told the court that she and her husband had had an altercation in which he had repeatedly slammed her head against his knee and against the dashboard of their car.) The restraining order gave Ms. Strother exclusive custody of the couple's child, A.S. District Court Judge Peter Ashman, the judicial officer who presided at the hearing, notified Ms. Strother that a second hearing would be held on May 26, 1992 to determine whether her custody of A.S. should be extended for 90 days under AS 25.35.010.

The next day (May 12, 1992), Timothy Strother requested a hearing to contest Judge Ashman's issuance of the 20-day restraining order, and particularly the portion of that order that gave Ms. Strother exclusive custody of A.S. Strother asserted that his wife was an unfit mother; he asked the court to give custody of A.S. to his mother and grandmother.

Both Mr. and Ms. Strother appeared in court on May 13, 1992. The court denied Mr. Strother's request to modify the custody order. At the same time, the court notified him that a further hearing would be held on May 26 to determine whether Ms. Strother's custody of A.S. should be extended for another 90 days.

Evangeline Strother appeared for the hearing on May 26, but Timothy Strother did not. Mr. Strother had left the state of Alaska, although he remained in telephonic contact with his wife. Judge Ashman extended Ms. Strother's custody of A.S. for an additional 90 days. At the conclusion of the hearing, the court provided Ms. Strother with a copy of this 90-day custody order.

On May 28, 1992, the clerk's office mailed two copies of the 90-day custody order to Mr. Strother, one by regular mail and one by certified mail. On June 4, 1992, the proof-of-service receipt attached to the certified letter was returned unsigned and undelivered.

On July 4, 1992, Strother returned to Alaska, flying into Anchorage sometime before 11:00 p.m.. He drove to his mother's house in Palmer and picked up A.S., who was

spending the night there. With A.S. in tow, Strother drove back to Anchorage and boarded a red-eye flight to an out-of-state destination.

The next day (July 5), Ms. Strother came to her mother-in-law's house to retrieve A.S.. Her mother-in-law told her that Strother had taken the child to Montana and that he had left behind two letters for her. In those letters, Strother told his wife that she would never see him or A.S. again. Later that day, Ms. Strother informed the police that her husband had taken A.S. in violation of a court order. Through a friend, Ms. Strother supplied the police with a copy of Judge Ashman's 90–day custody order.

Strother maintained telephonic contact with his wife even after July 4, 1992, although he refused to divulge his location or the location of their child. Strother's mother, Sheila Byington, acted as the go-between for the couple, telling Ms. Strother when to expect a call from Strother. Eventually, the police traced one of Strother's telephone calls, discovering that it originated in Rapid City, South Dakota. Working with the authorities, Ms. Strother arranged to meet her husband at the Rapid City airport on August 18, 1992; there, agents of the Federal Bureau of Investigation arrested Strother. Strother was subsequently returned to Alaska to stand trial for first-degree custodial interference, AS 11.41.320(a).

Ms. Strother apparently reconciled with her husband before trial, for she proved to be a cooperative witness for the defense. Previously, at grand jury, Ms. Strother had testified that she was the exclusive custodian of A.S. under the 90–day domestic violence order and that Strother had taken the child without her permission. She also had testified that Strother knew of the 90–day custody order when he took A.S. from Alaska because she had personally told him about the order. However, at Strother's trial, Ms. Strother stated that she herself had been unaware of the existence of the 90–day custody order. Ms. Strother asserted that she could not remember attending the May 26 hearing and could not remember ever receiving a copy of the 90–day order. She testified that she told her husband that the judge had declined to grant the order.

Alaska law provides two degrees of custodial interference. The basic elements of the crime are defined in the second-degree custodial interference statute, AS 11.41.330. The crime becomes first-degree custodial interference "if the [defendant] violates AS 11.41.330 and causes the victim to be removed from the state". AS 11.41.320(a).

Strother conceded that he removed his daughter from Alaska. Thus, the dispute at Strother's trial centered upon the remaining elements of the crime—the ones found in the second-degree custodial interference statute, AS 11.41.330(a). The pertinent portion of this statute provides:

> A person commits the crime of custodial interference . . . if, being a relative of a child under 18 years of age . . . and knowing that the person has no legal right to do so, the person takes, entices, or keeps that child . . . from a lawful custodian with intent to hold the child . . . for a protracted period.

For purposes of this statute, the term "relative" includes a parent, and the term "lawful custodian" means "a parent, guardian, or other person responsible by authority of law for the care, custody, or control of another". AS 11.41.370(1)–(2).

In her instructions to Strother's jury, Superior Court Judge Beverly Cutler informed the jury that, to prove the crime of custodial interference, the State had to establish:

> [4] [that Strother] took, enticed, or kept A.S. from a lawful custodian, to wit: Evangeline Strother;
>
> [5] [that Strother] intended to hold A.S. for a protracted period of time; [and]
>
> [6] [that Strother] knew he had no legal right to take A.S. from Evangeline Strother for a protracted period of time[.]

Elaborating on this definition of the elements of the crime, the court instructed the jury:

> A parent is prohibited by law from taking a child away from the other parent with the intent to keep the child for a protracted period of time to the exclusion of the other parent. Only a judicial order depriving a parent of custody permits a

parent to deprive the other parent of the joint custody of the child.

As to element six ..., this element can be proved either by the state proving ... that the defendant "knew" [as defined in AS 11.81.900(a)(2)] there was a custody order in effect giving temporary custody of A.S. to Eve Strother, or by the state proving ... that the defendant knew his taking and keeping of A.S. was without legal authority.

Relying on his wife's testimony, Strother argued that he was never informed of the 90-day custody order issued on May 26, 1992. He contended that, as far as he knew, he remained a joint custodian of A.S. and he retained the legal right to take his child where he wished.[1] Thus, Strother asserted that even if the 90-day custody order did in fact temporarily end his legal right to exercise custody over A.S., he nevertheless lacked the culpable mental state for the crime of custodial interference because he remained ignorant of the 90-day order and therefore he did not know that his actions were unlawful.

The prosecutor argued that the 90-day custody order was, for the most part, irrelevant. If Strother knew about the 90-day order, then his actions were clearly illegal. However, the prosecutor argued, even if the 90-day order had never been issued (so that Strother and his wife each remained a joint custodian of their child), Strother would still know that he had no right to take the child, flee the state, and keep the child hidden from his wife so that she was no longer able to exercise her right of custody.

During their deliberations, the jury sent the court a note indicating that they believed the State had failed to prove that Strother knew of the 90-day custody order; they asked the court to clarify element six:

We feel the state did not prove the defendant did in fact have knowledge of the 90-day court order. Is this an issue by itself? Do we need to decide 6.B as ... part of 6.A, or on its own merit[?]

The jury's question referred to the court's instruction that "element six ... can be proved either by [proof] ... that the defendant knew there was a custody order in effect giving temporary custody of A.S. to Eve Strother, or by [proof] ... that the defendant knew his taking and keeping of A.S. was without legal authority." (emphasis added) In response to the jury's question, Judge Cutler told the jury that they could base their verdict on either theory. Shortly thereafter, the jury found Strother guilty. It therefore appears that the jury relied on the alternative theory presented in the court's instructions: the theory that Strother, even if he was unaware of the 90-day order, was nevertheless aware that he had no legal right to keep A.S. hidden from his wife.

On appeal, Strother argues that the jury instructions were fatally flawed to the extent that the instructions allowed the jury to convict Strother even after they found that he was not aware of the 90-day custody order. Strother's argument is directed to two different aspects of the custodial interference statute: the actus reus of the crime and the culpable mental states required to make that actus reus a criminal offense.

■ Strother's argument with respect to the actus reus of the crime begins with the fact that, by law, a child's parents jointly share physical custody of the child unless some judicial event alters this situation. See L.A.M. v. State, 547 P.2d 827, 832 n. 13 (Alaska 1976); Appeal of Maricopa County Juvenile Action, 163 Ariz. 60, 785 P.2d 1248, 1250 (App.1990). Strother contends that, unless a court has taken action to alter a parent's right of physical custody, a parent is

1. We recognize that the terms "custody" and "custodian" have several legal meanings, depending upon the context in which the terms are used. Strother's appeal involves parents' right to physical custody of their children. This case requires us to interpret the offense of custodial interference in the context of a custody dispute between two parents, neither of whom has been awarded primary physical custody of their child.

Thus, when we use the term "custody" in this opinion, we confine our meaning to a parent or guardian's right to physical custody of a child. When we say that one of two parents is a "joint custodian" of a child, we mean that no court has altered the parent's normal right to physical custody of the child by either temporarily or permanently awarding primary physical custody of the child to the other parent or to someone else.

always entitled to "take" and "keep" a child from the child's other parent, even if the parent's actions effectively defeat the other parent's right of custody.

Traditionally, parents who abducted their children were exempted from such crimes as kidnapping and child-stealing (unless a court had judicially terminated the parent's right of custody). *See* Annotation, "Kidnapping or Related Offense by Taking or Removing of Child by or under Authority of Parent or One in Loco Parentis", 20 A.L.R.4th 823 (1983), § 3 at 828–830. However, the question of whether Strother's conduct violated Alaska's custodial interference statutes is a question of statutory interpretation and thus of legislative intent. Did the Alaska Legislature intend AS 11.41.320 and AS 11.41.330 to reach the conduct of a parent whose right to physical custody of the child remains undiminished but whose conduct deprives the other parent of his or her right to custody? [2]

During the past twenty years, the federal Congress and the state legislatures have focused increasing attention on the problem of child custody disputes and the related problem of child abduction by a parent or other relative. In 1977, the Alaska Legislature enacted the Uniform Child Custody Jurisdiction Act, AS 25.30. The legislature declared that one of the chief purposes of this legislation was to "deter abductions and other unilateral removals of children [by people seeking] to obtain custody awards". Three years later, Congress passed the federal Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A. In its accompanying findings and declaration of legislative purpose, Congress found that "parties involved in [child custody] disputes ... frequently resort to the seizure, restraint, concealment, and interstate transportation of children". For this reason, Congress found it necessary to "establish a na-

tional system for locating parents and children who travel from one [state] to another and are concealed in connection with [child custody] disputes", and to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards". Section 7, Public Law 96–611.

During the same period as this reformation of child custody laws, the Alaska Legislature was formulating this state's present criminal code. In February 1977, the Criminal Code Revision Subcommission published its tentative draft of the offenses of kidnapping and custodial interference. Under the kidnapping statute drafted by the Subcommission, a parent or other relative who abducted a child would not be guilty of kidnapping if the parent or relative's "sole intent [was] to assume control over [the child] and the abduction [was] not coupled with [an] intent to use or threaten ... deadly physical force or intent to sexually assault the [child]." However, added the Subcommission, "while the [parent or other relative] has not committed kidnapping, he [or she] may have committed custodial interference". Commentary to "Kidnapping and Related Offenses", Tentative Draft, Vol. 1, pp. 61–62.

The Subcommission's draft of the custodial interference statute read as follows:

A person commits the crime of custodial interference ... if, knowing that he has no legal right to do so, he takes, entices, or keeps a person from his lawful custodian with intent to hold him permanently or for a protracted period.

TD 11.41.330, Tentative Draft, Vol. 1, p. 53. The Subcommission declared that this statute was "intended to cover the typical 'child-stealing' committed by a relative", and the Tentative Draft specifically defined "relative"

**2.** The decisions in this area repeatedly turn on the particular wording and legislative history of the statute under consideration. For example, Strother cites a single case in support of his argument that a joint custodian can never commit the crime of custodial interference. That case, *Cline v. Superior Court*, 135 Cal.App.3d 943, 185 Cal.Rptr. 787 (1982), involved a parent charged with child stealing. The California court focused on the fact that the California Legislature, when it enacted the crimes of kid-

napping and child stealing, declined to adopt language that would have included parents among those who could commit these crimes. *Cline*, 185 Cal.Rptr. at 789–790. *See also People v. Fields*, 101 Mich.App. 287, 300 N.W.2d 548 (1980), *aff'd*, 413 Mich. 498, 320 N.W.2d 663 (1982) (another case holding that parents were excluded from the scope of a kidnapping statute, the decision explicitly turning on statutory construction).

to include a parent. *See* Commentary to "Custodial Interference in the First and Second Degree," Tentative Draft, Vol. 1, p. 62; TD 11.41.370(3). "The language of the [proposed] statute is broad enough to encompass any interference with lawful custody rights by a person having no legal right to do so if [this person] has the intent to hold the person taken for a protracted period." Commentary to TD 11.41.330, Tentative Draft, Vol. 1, pp. 62–63.

In addition, the Subcommission specified that the victim of the crime is not only the child but also the custodian who has been deprived of the child's custody: "[The statute] protect[s] parental custody against all unlawful interruption, even when the child ... is a willing, undeceived participant in the attack on this interest of its parent." Tentative Draft, Vol. 1, p. 65 (quoting the Model Penal Code § 212.4, Comments (Tent.Draft No. 11, 1960)).

The legislature echoed the Subcommission's comments when it passed the custodial interference statutes, AS 11.41.320 and AS 11.41.330. In its commentary to these two statutes, the legislature declared:

> [T]he statutes on custodial interference protect "parental custody against all unlawful interruption, even when the child itself is a willing, undeceived participant in the attack on this interest of its parent." Model Penal Code § 212.4, Comments (Tent.Draft No. 11, 1960).
>
> The [crime] encompasses any interference with lawful custody rights by a relative acting with the intent to hold the victim for a protracted period. The defendant must know he has no legal right to interfere with the custody of the victim. The statute covers not only child custody situations, but also interference with children in state custody, incompetents or others who are entrusted by law to the custody of another person or institution.

1978 Senate Journal, Vol. II, Supp. No. 47 (June 12), p. 21. We also note that the legislature (again following the Subcommission's proposal) included parents within the group of "relative[s]" whose actions can constitute the crime of custodial interference. *See* AS 11.41.370(2).

This court has not previously addressed the question of whether, between two parents who retain equal right to physical custody of a child, one parent may commit the crime of custodial interference by keeping and concealing a child from the other parent. However, in a case involving parents who did not have equal custody rights, this court recognized that the gist of custodial interference is the defendant's unlawful deprivation of the other parent's right of custody.

*Wheat v. State*, 734 P.2d 1007 (Alaska App. 1987), involved a father who had been awarded periodic physical custody of his child during the summer months. The child's mother (who lived in Alaska), remained the child's primary physical custodian during the remainder of the year. The defendant father took the child to Arizona at the beginning of the summer but then failed to return the child to Alaska in the fall. Prosecuted for custodial interference, the father claimed that he had committed no crime in Alaska. He argued that even though he had unlawfully failed to return the child to its mother, this unlawful act had occurred in Arizona, and therefore Alaska had no jurisdiction over the crime. This court disagreed:

> [To prove the crime of custodial interference], the state was required to show that, as a direct result of [the defendant's] conduct, [the child's] mother was deprived of the lawful custody of her daughter—in other words, that [the child] was kept "from a lawful custodian." It is this prohibited result, rather than the proscribed conduct *per se*, that is the gravamen of the offense, and it is precisely this result that occurred in Alaska.

*Wheat v. State*, 734 P.2d at 1010–11 (footnote omitted).

The legislative history of AS 11.41.320–330 leads to the conclusion that Alaska's custodial interference statutes were intended to prohibit parents from abducting their children as a means of settling a custody dispute. The crime of custodial interference was designed to protect any custodian from deprivation of his or her custody rights—even if that deprivation results from the actions of a person who also has a right

to physical custody of the child. The crime does not focus on the legal status of the defendant, but rather focuses on the defendant's actions, the effect of the defendant's actions, and the intent with which those actions were performed.

Other states have reached the same conclusion. In *People v. Harrison,* 82 Ill.App.3d 530, 37 Ill.Dec. 820, 402 N.E.2d 822 (1980), the defendant was charged with child abduction under Illinois law.[3] When the defendant and his wife were divorced, the court gave primary physical custody of their children to the mother and granted "liberal, reasonable visitation rights" to the defendant. During one of his visitations, the defendant packed his belongings into a bus and fled to Mississippi with the children. *Harrison,* 37 Ill.Dec. at 821–22, 402 N.E.2d at 823–24. The defendant argued that he could not commit this crime because his right of custody was equal to that of his former wife. The Illinois court disagreed:

> Custody is a form of guardianship, and joint custody merely reflects the law of Illinois [that] parents have equal powers, rights, and duties concerning the minor. It therefore follows that neither parent could remove the children without infringing on the powers [and] rights of the other.
>
> . . . .
>
> In our view, even assuming *arguendo* that there was some form of custody in [the] defendant, there was also custody in another within the meaning of the statute. . . . The remedial purpose of the child abduction statute is so obvious as to need little exegesis on our part. The number of parents who in recent times have seen fit to seize their children . . . and spirit them off to another jurisdiction has increased dramatically. The legislature quite obviously felt that the civil penalties for such conduct were insufficient.

*Harrison,* 37 Ill.Dec. at 822, 402 N.E.2d at 824 (internal quotations omitted).

The Oregon Court of Appeals reached the same result in *State v. West,* 70 Or.App. 167, 688 P.2d 406 (1984). Like *Harrison,* *West* involved a divorced couple; the father was awarded primary physical custody of the child for three days each week (as well as during his vacation), while the mother was awarded primary physical custody at all other times. One day when the father went to pick up the child, he found the mother's apartment empty of all its furniture; the mother had fled with the child. One month later, the mother was located in Missouri; she was arrested and brought back to Oregon. Prosecuted for custodial interference, the mother defended by asserting that it was legally impossible for her to commit the crime because she had been awarded primary physical custody in the divorce. *West,* 688 P.2d at 407.

Oregon's definition of custodial interference is quite similar to Alaska's.[4] Construing this statute, the Oregon court held that even when each parent retains custody rights over the child, neither parent is authorized to take actions that "infring[e] the powers, rights, and duties of the other". *West,* 688 P.2d at 408. The court stated:

> Clearly, the primary focus of the statute is the protection of the rights and interests of the two victims of the offense: the child and the "lawful custodian" from whom the child is "taken, enticed or kept." The focus is not on the legal status of the one who does the taking, enticing or keeping from.
>
> . . . .
>
> When [the] defendant removed the child from [this] state and failed to disclose her whereabouts, she was infringing on the rights . . . of the father. The emotional and financial costs suffered by him in trying to locate his daughter are among the

---

**3.** "A person commits child abduction when, with intent to violate a court order awarding custody of a child to another, he or she . . . removes the child from Illinois without the consent of the person lawfully having custody of the child[.]" Illinois Revised Statute 1991, ch. 38, para. 10–5(b)(1).

**4.** "A person commits the crime of custodial interference . . . if, knowing or having reason to know that the person has no legal right to do so, the person takes, entices or keeps another person from the other person's lawful custodian with intent to hold the other person permanently or for a protracted period of time." Oregon Revised Statute 163.245(1).

primary evils that the statute was intended to deter. *See* Oregon Criminal Code of 1971, *Commentary* at 129 (1975). To interpret the statute as [the] defendant suggests would clearly be contrary to the parental rights the statute was intended to protect.... [The] defendant cannot rely on her joint custodial status to justify the act of secreting her daughter.

*West,* 688 P.2d at 408 (footnote omitted). *See also People v. Morel,* 164 A.D.2d 677, 566 N.Y.S.2d 653 (N.Y.App.1991).

Strother argues that *Harrison* and *West* are not on point because, in each case, a court had issued a decree defining the legal rights of the parents. He argues that a parent who violates the terms of a court decree may be guilty of custodial interference, but, in the absence of a court decree, no parent can violate the statute. We disagree. It is true that the court decrees in *Harrison* and *West* altered circumstances by setting out specific periods of time during which each parent would have primary physical custody of the children. However, in both cases, the defendant was not convicted simply because he or she took or kept physical custody of the child beyond the particular hours or days set forth in the court decree. Rather, in each case, the defendant's conviction was based on the fact that the defendant absconded with the child and hid the child from the other parent—thus completely depriving the other parent of his or her right of joint custody.

Moreover, courts have upheld convictions for custodial interference even in the absence of a court decree defining the respective custody rights of the two parents. The Arizona Court of Appeals confronted such a case in *State v. Donahue,* 140 Ariz. 55, 680 P.2d 191 (App.1984).

In *Donahue,* a child had been born out of wedlock to Donald Jones and Edrie Hale. Ms. Hale had physical custody of the child. Jones recruited the defendant Donahue to abduct the child from Hale. When Donahue was prosecuted for custodial interference, she defended by asserting that she had acted as the agent of the child's father. Donahue argued that, since both the child's father (Jones) and the child's mother (Hale) enjoyed co-equal custodial rights, Jones could not be guilty of custodial interference and therefore neither could any person acting on Jones's behalf. *Donahue,* 680 P.2d at 192. The Arizona court rejected this argument, commenting:

Even assuming that Jones had a right to custody of the child, ... his right was at most a right to co-equal custody with the child's natural mother. He did not have the right to custody of the child to the exclusion of the mother, in the absence of a court order to that effect. The surreptitious actions of [Donahue] and her cohorts in snatching the child and absconding with their possessions first to Nevada and then California support the inference that [Donahue] knowingly deprived the mother of her right to custody and that [Donahue] knew or had reason to know that she had no legal right to do so. The evidence is sufficient to support a conviction for custodial interference.

*Donahue,* 680 P.2d at 193.

The same result was reached by a Delaware superior court in *State v. Todd,* 509 A.2d 1112 (Del.Super.1986). Todd and a woman named Porter lived together and had a child out of wedlock; when they later separated, Porter assumed primary care of the child, but Todd continued to visit the child periodically. Todd offered to take care of the child over a weekend. Instead of returning the child to Porter when the weekend was over, Todd fled with the child to Texas. *Todd,* 509 A.2d at 1113. He was caught and charged with custodial interference.

Todd argued that, "as [the child's] natural father, [and] absent a valid custody order to the contrary, his right of physical custody [was] equal to the mother's", and therefore he could not be guilty of custodial interference. *Todd,* 509 A.2d at 1113. The Delaware court rejected Todd's construction of the statute, declaring that "this view would ... permit[ ]—indeed, encourag[e]—parents to engage in the type of reprehensible conduct which this defendant father unabashedly admits." *Id.* at 1114. The judge wrote:

It is clear that the provisions of [Delaware law] delineate rights and responsibili-

ties between natural parents [even] where no valid custody order exists. Indeed, it has been recognized that a court order of joint custody may effect no different status in fact or in law than would exist in the absence of a court order.

. . . .

I simply cannot accept the proposition that the legislature intended that children and their [natural] parents who are joint custodians [in the absence of any court order] should not have the protection of the criminal justice system *vis a vis* the proscription of the custodial interference statute.

. . . .

In the case *sub judice*, therefore, the mother had equal rights ... with respect to [the couple's daughter]. When the father absconded with [the child] to Texas he infringed on the rights ... of the mother. I am satisfied [that] a parent, absent any valid custody order to the contrary, has no legal right to take a child into his or her own exclusive physical .:. custody to the exclusion of the other parent's lawful custodial rights.

*Todd*, 509 A.2d at 1115–16.

Based on our examination of the legislative history of AS 11.41.320–330, and based on the general development of the law in this area (as exemplified by the cases cited above), we conclude that Alaska's custodial interference statutes embody the rule that, when a child is entrusted to joint custodians, neither custodian may take exclusive physical custody of the child in a manner that defeats the rights of the other joint custodian. However, when the defendant is a joint custodian of the child, the actus reus of the crime must be examined with care.

AS 11.41.330(a) declares that a parent or other relative of a child commits the crime of custodial interference if

knowing that [he or she] has no legal right to do so,

the defendant

takes, entices, or keeps that child ... from a lawful custodian

and the defendant performs this act

with intent to hold the child ... for a protracted period.

The first and third of these elements are culpable mental states; they specify what the defendant must know about his or her conduct (that he or she has no legal right to engage in this conduct), and what result the defendant must intend to accomplish by this conduct (holding the child for a protracted period). The second element is the actus reus of the crime—the physical aspect of the offense.

The statute uses the phrase "takes, entices, or keeps [a] child ... from a lawful custodian" to describe the prohibited act. However, the statute also requires the State to prove that the defendant performed this act with knowledge that he or she "ha[d] no legal right to do so". Thus, the statute implicitly requires proof that the defendant's taking, enticing, or keeping of the child was itself unlawful. That is, the actus reus of the crime is the act of taking, enticing, or keeping a child from a lawful custodian with "no legal right to do so".

As defined in AS 11.41.370(2), a child's "relatives" include the child's stepparents, aunts and uncles, siblings, and all other ancestors besides the child's parents, whether related by blood, marriage, or adoption. These relatives have no right to physical custody of the child unless a court affirmatively gives them custody. If such a relative were to "take" or "entice" the child from a lawful custodian, the very act of taking or enticing would exceed the relative's legal authority.

■ The situation is different, however, when the relative at issue is the child's parent. Until a court orders otherwise, each parent has a right to physical custody of the child. So long as a parent shares physical custody of the child, a parent does not exceed his or her legal rights by merely "taking" the child from another lawful custodian or by merely "enticing" the child to leave the custody of another lawful custodian. (We leave aside instances in which one parent forcibly takes a child from the custody of the other parent.)

■ Back-and-forth shifting of physical custody is normal in a joint custody situation.

When parents are joint custodians of a child, they repeatedly take exclusive physical control of the child on a temporary basis for any number of reasons. A parent may drive the child to school or to other activities, may take the child to a movie or to a restaurant, or may travel with the child to distant destinations. A parent who remains a joint custodian can take the child away from home—even outside the state—without violating the custodial interference statutes, because such an act generally does not deprive the other joint custodian of his or her custody rights.

■ A parent's act of peaceably taking sole physical possession of a child does not exceed the parent's legal authority (does not infringe the custody rights of the other lawful custodian) unless the parent also performs other acts that alter the act of taking, converting it into conduct that defeats the custody rights of the other custodian. In the words of the custodial interference statute, this concept is expressed by the act of "keeping".

The former crimes of larceny and embezzlement offer an analogy to this concept. At common law, larceny was a theft committed when a defendant unlawfully took possession of another person's property and appropriated it to his or her own use. To prove larceny, the government not only had to prove that the defendant intended to use someone else's property for purposes inconsistent with the owner's rights, but also had to prove that the defendant had no right to take possession of the property—that the defendant committed a trespass by the very act of laying hands on the property. The statutory crime of embezzlement was enacted to deal with thefts committed by people who were entitled to possess the property (the property owner's employees and agents). Embezzlement was committed if the defendant came into possession of the property lawfully but then used the property in ways that defeated the owner's rights.[5]

■ Similarly, if two parents are jointly entitled to physical custody of a child, each has the right to assume temporary exclusive custody. Normally, a parent commits no "trespass" by peaceably taking physical custody of the child. But if a parent takes custody of the child and exercises that custody in a manner that defeats the custody rights of the other parent, unlawfully "keeping" the child from the other parent, then the parent's conduct constitutes the actus reus of custodial interference.

■ When Strother took his daughter from his mother's home, he acted without his wife's knowledge but he took custody of the child peaceably. Therefore, assuming the jury found that Strother was unaware of the 90–day custody order, Strother's mere act of "taking" the child was within his legal authority and did not constitute the actus reus of custodial interference. However, immediately afterward, Strother engaged in acts that undeniably defeated his wife's co-extensive right of custody. He removed the child to another state; he left two letters telling his wife that she would never again see either him or their daughter; and for several weeks he was successful in keeping both his own whereabouts and the child's whereabouts hidden from his wife and the authorities. We conclude that this conduct was sufficient to constitute the actus reus of the offense of custodial interference: the keeping of A.S. with "no legal right to do so".

The jury instructions in this case are somewhat ambiguous on the issue of what conduct constituted the actus reus of the offense. As explained above, the jury was told that the crime required proof that Strother "took, enticed, or kept A.S." from his wife. In explanation of this element, the jury was told that "[a] parent is prohibited by law from *taking* a child away from the other parent with the intent to keep the child

5. "The legislative history of the offense [of embezzlement stems from] one large gap in the law of larceny[:] the [common law's] firm position that there is no ... larceny without trespass *de bonis*. Thus a servant who has received money or property for his master ... has [lawful] possession[.] [A] conversion by him is without trespass, and therefore not larceny, so an embezzlement statute was passed to cover such a case." Perkins & Boyce, *Criminal Law* (3rd ed. 1982), ch. 4, sec. 3, p. 353. "[T]he whole purpose of embezzlement is to proscribe certain [thievish] conduct not involving trespass[.]" *Id.*, at 357.

for a protracted period of time to the exclusion of the other parent." (emphasis added)

The problem with this latter segment of the instructions is that it apparently authorized the jury to convict Strother merely upon proof that (1) he "took" A.S. and (2) he *intended* to perform further acts that would have defeated his wife's right of custody. This is not sufficient proof of actus reus. As we construe AS 11.41.330(a), a parent must perform acts that *actually* defeat the other parent's right of custody, *and* the parent must perform this actus reus with the specified culpable mental states: (1) knowledge that he or she has no legal right to engage in these acts, and (2) an accompanying intent to keep the child for a protracted period of time. If Strother's custody of A.S. never actually infringed his wife's right to custody, then he could not be convicted of custodial interference regardless of his bad intentions. (Under such circumstances, he might be guilty of an attempt, but not the completed crime.)

However, from our examination of the instructions as a whole, it appears that the court used the terms "take" and "keep" interchangeably. For instance, when defining the sixth element of the crime, the court told the jurors that the State had to prove that Strother "knew he had no legal right to *take* A.S. from Evangeline Strother *for a protracted period of time* ". In this phrase, "take ... for a protracted period of time", the court was employing the word "take" in the sense of "keep". The court further told the jurors that, to prove element six, they had to find "that the defendant knew his taking *and* keeping of A.S. was without legal authority". (As explained later in this opinion, Strother expressly assented to the wording of this instruction.)

Moreover, the facts of this case leave little room for jury confusion. Strother never seriously contended that his actions were consistent with his wife's right to physical custody of their daughter. It is clear that Strother not only "took" A.S. but also "kept" her in a manner that defeated his wife's custody rights. In arguing this case to the jury, the prosecutor stressed the fact that Strother had not merely assumed physical custody of A.S. but had removed A.S. from Alaska and had hidden the child from her mother, completely cutting off mother from daughter. Under these facts, Strother's conduct uncontestably constituted the actus reus of custodial interference. Therefore the seed of ambiguity in the jury instructions never germinated into prejudicial error.

Strother argues that if Alaska's custodial interference statutes are construed to cover a parent who deprives the other parent of his or her right of joint physical custody, then the statutes are void for vagueness. Strother basically contends that it is unreasonable to expect parents who have simultaneous rights of custody to know the boundaries of their custody rights and to know when one parent's actions would begin to violate the rights of the other parent. Strother relies on a remark by Judge Cutler that "three out of four divorce lawyers might not necessarily agree on whether a person does or does not have the right to do [what Strother did]". Strother asserts that if lawyers could disagree about a statute's meaning, then the statute must surely fail to give adequate notice of what conduct is prohibited.

The fact that lawyers might disagree about the meaning of a statute does not mean that the statute is unconstitutionally vague.

> [T]he fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional. The question is whether the statute's meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis. If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law makes the statute's meaning clear, then the statute is constitutional.

*DeNardo v. State*, 819 P.2d 903, 908 (Alaska App.1991) (emphasis in the original).

Nevertheless, Strother's point can not be ignored. The actus reus of the custodial interference statutes can be problematical

when the defendant is a parent who has custody rights to the child. We acknowledge that there is a potential vagueness in defining the actus reus of the crime in terms of conduct that defeats the other parent's right to custody when there is no court order defining the exact contours of that custody. After a court decree has specified the hours or days of each parent's physical custody of the child, it is fairly easy to identify conduct that infringes another parent's right of custody. But when both parents retain their original, undifferentiated joint right of custody, attempts to specify the actus reus of custodial interference are hampered by an unavoidable degree of imprecision.

Difficult cases might be presented by situations in which one parent assumes protracted exclusive physical custody of the child without the other parent's knowledge and perhaps contrary to the other parent's previously expressed wishes. For instance, following a quarrel about the advisability of visiting relatives in another state, one parent might decide to unilaterally resolve the issue by taking the child on the trip and leaving the other parent behind. This parent's action would constitute a prolonged assertion of exclusive physical custody. But, assuming that the parent keeps the child away from home only for the length of a reasonable visit with relatives, one might well question whether this parent has acted in such a way as to defeat the custody rights of the other parent.

This and similarly difficult cases may conceivably arise in applying the actus reus of custodial interference to joint custody situations. Nevertheless, "the possibility of difficult or borderline cases will not invalidate a statute where there is a hard core of cases to which the ordinary person would doubtless know the statute unquestionably applies." *Holton v. State,* 602 P.2d 1228, 1236–37 (Alaska 1979) (quoting *Stock v. State,* 526 P.2d 3, 9 (Alaska 1974)). Strother's actions of secretly removing and hiding his daughter, keeping the child from his wife and refusing to disclose the child's location, epitomize the conduct that the custodial interference statutes prohibit. If a parent engages in such actions, and if the parent acts with the two

culpable mental states required by the custodial interference statutes (knowledge that he or she has no legal right to engage in these actions, and intent to hold the child for a protracted period), then persons of ordinary understanding would have no trouble concluding that the parent has committed the crime of custodial interference as defined in AS 11.41.330(a).

Compare *Michael v. State,* 767 P.2d 193 (Alaska App.1988), *overruled on other grounds, Michael v. State,* 805 P.2d 371 (Alaska 1991), in which this court held that a parent may be convicted of assault for failing to take action to prevent another person from harming his or her child. The defendant in *Michael* argued that if the assault statute were construed to impose criminal liability on parents for failure to protect their children, then the statute did not give adequate notice of what conduct was prohibited. This court replied:

> Reasonable people may differ about the outer boundaries of a parent's duty to protect his or her child from harm, and about the appropriateness of using the criminal law to enforce that duty at or near the outer boundaries.... However, the duty of a parent to protect a child from severe abuse such as occurred in this case is crystal clear. We conclude that the statute is not vague as applied to this case.

*Michael,* 767 P.2d at 199–200 (citations omitted).

Under the facts of Strother's case, it was "crystal clear" that Strother lacked any legal right to abduct his daughter and keep her hidden from her mother. For these reasons, we conclude that Alaska's custodial interference statutes are not unconstitutionally vague as applied to Strother.

■ Strother next argues that one of the jury instructions improperly lightened the State's burden of proof by allowing the jury to assume that any person would know that one parent can not abduct and hide a child from the other parent. The jury instructions do not bear out Strother's claim. The court instructed the jury that the State had to prove, beyond a reasonable doubt, that Strother "knew he had no legal right to take A.S. from Evangeline Strother for a protract-

ed period of time". In his summation, the prosecutor argued that any member of our society would know that a parent has no legal right to abduct a child and keep the child hidden from the other parent. However, the jury instructions clearly required the jury to find, not that this proposition was common knowledge, but rather that Strother himself knew he had no legal right to take his daughter and keep her hidden from his wife. Strother's secretive abduction of the child, his immediate flight from Alaska, and his ensuing refusal to reveal his whereabouts or the child's whereabouts are all circumstantial evidence supporting the jury's conclusion that this element of the State's case had been proved beyond a reasonable doubt.

■ In his last argument on appeal, Strother asserts that the jury instructions contain a fatal ambiguity concerning the culpable mental state needed for the crime. The court's first instruction on the elements of the offense told the jury that one element of custodial interference was that Strother "knew he had *no legal right* to take A.S. from Evangeline Strother for a protracted period of time". (emphasis added) Strother does not attack this instruction. However, Strother points out that the court's accompanying instruction told the jury that this culpable mental state could be established by proof "that the defendant knew his taking and keeping of A.S. was *without legal authority*". Strother asserts that this language incorrectly shifted the burden of proof regarding his knowledge of the possible illegality of his actions.

Strother concedes that the first phrase, "knew he had no legal right", correctly states the culpable mental state. However, Strother maintains that the jury might have erroneously interpreted the second phrase, "knew [he acted] without legal authority", to mean that Strother could be convicted merely upon proof that he knew that no court had explicitly given him the authority to take A.S. and keep the child from his wife. In other words, Strother points out that there is a difference between (a) knowing that an action is prohibited and (b) knowing that no one has explicitly authorized the action.

The wording that Strother challenges on appeal was drafted by the trial judge during the discussion of jury instructions at Strother's trial. At that time, Strother's attorney explicitly accepted this wording:

DEFENSE ATTORNEY: The statute clearly indicates that [the defendant] must have positive knowledge that he does not have the right to take the child.

THE COURT: And the Court is going to instruct the jury exactly on that. That he does have to know.... [The defendant] can be guilty if he knew there was the custody order or [if] he knew he didn't have a right to do it even if there wasn't a custody order. But in terms of rewording ... this instruction ...

DEFENSE ATTORNEY: Your Honor, I would be happy ... if the [instruction said] he can be guilty if he knew there was a custody order [or] he can be guilty if he didn't know there was a custody order but he knew it was illegal. I think that's clear. [But] I think [the prosecutor's proposed instruction] is not clear.... [T]he way this is explained [in the prosecutor's proposal], it's incredibly confusing.

THE COURT: Well, I'm going to respect your opinion, because ... I know I get jaded [by repeatedly] hearing the same language.... I can think something is clear when it isn't. So I'm certainly willing to be open-minded to that. I'm ... inclined to [alter this instruction to read] "As to element six [of the elements instruction], this element can be proved either by the State proving beyond a reasonable doubt that the Defendant knew there was a custody order in effect giving temporary custody of A.S. to Eve Strother, or by the State proving beyond a reasonable doubt that the defendant knew his taking and keeping of A.S. was without legal authority."

I'll repeat [that]. The instruction would read, "As to element six, ..."

[The Court repeats the proposed language verbatim.]

DEFENSE ATTORNEY: I'm satisfied with that.

Because Strother explicitly accepted this wording at trial, his appellate attack on this

instruction must fail unless he demonstrates plain error. *Aviation Associates, Ltd. v. Temsco Helicopters, Inc.*, 881 P.2d 1127, 1131 (Alaska 1994). In this context, "[p]lain error exists when a jury instruction obviously creates a high likelihood that the jury will follow an erroneous theory resulting in a miscarriage of justice." *Id.* at 1131 n. 7, quoting *Ollice v. Alyeska Pipeline Service Co.*, 659 P.2d 1182, 1185 (Alaska 1983).

We find no plain error here. The language Strother challenges does not plainly suggest an erroneous definition of the culpable mental state. At most, the phrase "without legal authority", when viewed in isolation, might conceivably create the ambiguity Strother complains of. However, this phrase did not appear in isolation. The court's elements instruction told the jury that Strother had to know that he "had no legal right" to take the child. During his summation to the jury, the prosecutor did not ask the jury to convict Strother under the theory that he knew no court had issued a decree allowing him to take the child. Rather, the prosecutor argued that Strother, as one of two parents who each had custody rights, knew that he had no legal right to keep the child hidden from her mother.[6] Given this record, there was no reasonable possibility that the jury was led astray by the variation in the court's phrasing.

The judgement of the superior court is AFFIRMED.

---

**6.** At various points during his closing argument, the prosecutor stated:

> [Mr. and Ms. Strother] were both lawful custodians. They were both parents [who] had a right to see their child.... Both of them were lawful custodians. Neither one of them had a right to infringe on the rights of the other to the extent of taking that child away *and going to Barrow, going to Nome,* and hiding out and not disclosing the whereabouts of that child ... to the other parent.
>
> [Strother had] to know it [was] illegal.... I'll just get right to the point of it—know it [was] prohibited.... Now I suggest to you that, even if [the court had not issued the 90-day] custody order, that you still know that

[these actions are] illegal. Not [under] the order, but just by common sense and your understanding of how our society works. In other words, ... the law is [that] you can't take a child from the other person and hide out.

[Strother] came in that night [and then] left [with the child]. And then he wouldn't say where he was. "You're not going to find me." He's holding the child. It's out of state. "I know I'm wrong. The cops are looking for me," is basically what he's saying. "I'm not going to tell you. You're not [going to] get that child. I know I'm wrong." ... You can come to the conclusion [that there] is a substantial probability that he knows it is illegal because of his conduct later.