**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-30126 |
| Plaintiff-Appellee, | D.C. No. 3:19-cr-00121-001-SLG |
| v. | |
| LEO JAMES CHAPLIN, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, District Judge, Presiding

Argued and Submitted April 13, 2022
Seattle, Washington

Before: BOGGS,[**] HAWKINS, and FORREST, Circuit Judges.

Leo James Chaplin, an American citizen, met his wife MDS[1] in the Philip-

pines. The two moved to the United States, married, had two children, and lived in

Alaska while taking occasional family vacations to the Philippines. In 2014, while

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Danny J. Boggs, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

[1] Chaplin's now-ex wife is referred to by her initials throughout.

experiencing relationship difficulties, Chaplin convinced MDS and their minor children (ages five and eight) to accompany him to the Philippines, where he absconded with the children under false pretenses and hid them from MDS—or prevented her from seeing them—for more than four years. When Chaplin took the children, MDS filed for divorce and custody in Alaska, and Chaplin did the same in the Philippines.

Amidst the custody proceedings, an Alaska court ordered Chaplin to return the children. When he refused (and repeatedly prevented MDS from visiting them abroad), MDS's attorney referred the case to the FBI, which issued a warrant for Chaplin's arrest for violating the International Parental Kidnapping Crime Act, 18 U.S.C. § 1204(a). Chaplin was arrested, extradited, and found guilty in federal court in a bench trial. Chaplin now appeals on the ground that the government failed to prove its case, and we affirm. A reasonable trier of fact could, as here, have found him guilty.

The parties present a single question on appeal: whether there was sufficient evidence for the district court to find that Chaplin violated the Act. The Supreme Court has defined the standard as "whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Chaplin points to two elements of the crime of international parental kidnapping that he claims were not sufficiently proved in this case. A person is guilty under the statute if he, in relevant part, "retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). Chaplin argues that (1) he did not "retain[ ]" the children by denying MDS access to them in the Philippines, because he never prevented them from leaving the country, and (2) he did not intentionally "obstruct the lawful exercise of parental rights" by filing for custody before a Philippine court, because MDS could have done the same but chose not to. However, Chaplin is incorrect on both points.

1.      The parties agree on the meaning of the verb "retain," but differ on whether Chaplin's actions constituted retention. *See United States v. Cummings*, 281 F.3d 1046, 1050 n.3 (9th Cir. 2002) (noting, in the context of international parental kidnapping, that "Webster's Dictionary defines 'retain' to mean 'to hold back, keep, restrain'" (quoting *Merriam-Webster's Collegiate Dictionary* 999 (10th ed. 1996))).

Contrary to what Chaplin claims, a person may be guilty of international parental kidnapping—may be retaining a child abroad—even if not "actively" preventing the child from traveling to the United States. The act of retention may be satisfied when a defendant passively declines to abide by lawful demands to return a

3

child. Here, when the Alaska Superior Court ordered Chaplin to return the children to MDS, he refused. The Alaska court therefore ordered Chaplin to show cause why he should not be held in contempt and again ordered the children returned in March; when Chaplin remained recalcitrant, the court held him in contempt and ordered the children returned for a third time in May. Chaplin was again sanctioned and again ordered to return the children in July. He never complied with the Alaska court's various orders.

Chaplin's consistent refusal to abide by lawful court orders, as well as the evidence presented at trial that the children never returned to the United States after they left in November 2014, show that, at the very least, a reasonable fact finder could find that he "retained" the children under § 1204(a). *See Jackson*, 443 U.S. at 319.

2.      Even though there was sufficient evidence of retention, Chaplin cannot be guilty of international parental kidnapping unless his retention was done "with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). The parental right in question, as defined by the statute, is "the right to physical custody of the child whether joint or sole (and includes visiting rights); and whether arising by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2). Here, the district court looked to the Hague Convention on International Child Abduction to determine which jurisdiction's child-custody laws

4

controlled.[2]  The Hague Convention, in turn, defines parental rights by reference to "the law of the State[3] in which the child was habitually resident immediately before the removal or retention"—in this case, Alaska.  Convention on the Civil Aspects of International Child Abduction art. 3(a), Oct. 25, 1980, T.I.A.S. No. 11670.

Chaplin now asserts that the filing of his Philippine child-custody petition operated to contest the Alaska court's jurisdiction, and that therefore the district court should not have looked to Alaska law to determine parental rights.  The timeline, however, partially belies his argument.  According to Chaplin's brief, "by the time [he] began retaining the children from leaving the Philippines, he was doing so pursuant to the pending child custody petition in the Philippines."  He is incorrect.  As

---

[2] The Hague Convention provides civil remedies for returning children to their country of residence after unlawful parental kidnapping, but does not (as is the case with § 1204(a)) prescribe criminal penalties.  Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1980, T.I.A.S. No. 11670; *see also* 18 U.S.C. § 1204(d) (stating that the Act "does not detract from The Hague Convention").  While the United States has signed and ratified the Convention, the Philippines only acceded to it in 2016.  Hague Conference on Private International Law, Status Table: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited May 16, 2022).  Because the United States has not yet declared its acceptance of the Philippines' accession, the agreement is not in force as between the two countries, and no civil remedy was available in this case. *See id.* art. 39.

[3] Although the term "State" in the Convention refers to signatory countries, the family law of the United States is determined by looking to the laws of one of the United States, and the legislative history makes clear that the Convention as applied to § 1204(a) should be read to refer to United States state law.  H.R. Rep. No. 103-390, at 4 (1993).

the indictment makes clear, the government alleged Chaplin began retaining the children for purposes of § 1204(a) "on or about November 24, 2014"—the date they left the United States, and just a few days before Chaplin absconded with the children—not three months later when Chaplin filed for custody. The district court said as much when it adjudicated Chaplin guilty, stating that "[i]n November 2014, there was no evidence of a court order . . . so one then looks to what were the parental rights to physical custody by operation of Alaska law."

Under Alaska law, "when a child is entrusted to joint custodians," which is assumed for married parents "[u]ntil a court orders otherwise," "neither custodian may take exclusive physical custody of the child in a manner that defeats the rights of the other." *Strother v. State*, 891 P.2d 214, 223 (Alaska Ct. App. 1995). To defeat the other parent's rights means "unlawfully 'keeping' the child from the other parent." *Id.* at 224. It is clear, then, that Chaplin's conduct while in the Philippines but prior to his child custody petition—when, a few days after the family arrived, Chaplin took the children away and concealed them—was sufficient evidence of obstruction of MDS's then-existing parental right of joint custody under Alaska law. *See ibid.* (concluding that the defendant violated his spouse's right to joint custody when, among other things, "for several weeks he was successful in keeping both his own whereabouts and the child's whereabouts hidden from his wife"). The trier of fact was therefore provided with facts sufficient to find that Chaplin committed

6

international parental kidnapping during the period specified in the indictment.

The government thus presented sufficient evidence for the district court to find Chaplin guilty of the crime of international parental kidnapping.

**AFFIRMED.**