Linda **VACHON**, Appellant,

v.

Robert **PUGLIESE**, Appellee.

No. S–7264.

Supreme Court of Alaska.

Nov. 8, 1996.

Rehearing Denied Nov. 29, 1996.

---

Christine A. McLeod and Carol H. Daniel, Alaska Legal Services Corporation, Fairbanks, and Bonnie J. Coghlan, Fairbanks, for Appellant.

Michael A. MacDonald, Downes, MacDonald & Levengood, P.C., for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

EASTAUGH, Justice.

## I. INTRODUCTION

Linda Vachon appeals orders awarding custody of her daughter, Jeana Pugliese, to Robert Pugliese and denying her motion for reimbursement of past child support. We considered this appeal on an expedited basis and on August 6, 1996, issued an order reversing the custody award and remanding for entry of an order granting custody to Linda. This opinion discusses the reasons for that order. It also addresses the non-custody issues.

## II. FACTS AND PROCEEDINGS

### A. Facts

Robert and Linda met in 1979 in Massachusetts. At that time Linda lived in Massachusetts and Robert lived in Alaska. They lived together in Alaska from 1986–87 and 1990–93. Linda became pregnant soon after she moved to Alaska in 1990. After Jeana was born on March 7, 1991, Linda and Jeana moved in with Robert and the parties lived together in Fairbanks until September 1993. Robert and Linda never married.[1]

In September 1993 Linda moved out of Robert's home, taking Jeana with her. After Linda and Jeana moved out, Robert did not

---

1. Linda was married to Vincent Morrison until July 18, 1991. Linda admits that Robert is Jeana's biological father and should be adjudicated the father, but asserts that Morrison "was not disestablished as the presumptive father."

see Jeana for about six weeks. Eventually Robert began visiting Jeana once or twice a week. In September 1993 Robert began paying child support of $300 a month. The parties did not seek or obtain a court order regarding custody, visitation, or support, and formalized no agreement about these issues.

Linda moved with Jeana to Sharon, Massachusetts, in June 1994. When Linda and Jeana left Alaska, Linda did not tell Robert that they were leaving or immediately inform him of their whereabouts. Linda testified that she left Alaska in this manner because Robert had been stalking her and she was afraid for her and Jeana's safety. A week or two after leaving Alaska, Linda called Robert at work. When Robert answered, Jeana told him that she did not live in Alaska anymore. Suspecting that Linda was either at her mother's home or at her sister's home, Robert contacted Linda at her sister's home. Robert testified that he continued to try to talk to Linda at least once a week, sometimes twice a week. Robert alleges that Linda "would not discuss anything with him."

### B. *Proceedings*

On September 12, 1994, Robert petitioned the superior court to establish paternity, custody, visitation, and support, requesting that he be granted sole legal and primary physical custody of Jeana. Robert also moved for temporary orders requesting, *inter alia*, joint legal and physical custody and visitation. On November 21 Judge Richard D. Savell ordered Linda to return Jeana to Alaska for visitation with Robert within seven days. On November 23 Robert notified Linda that he had purchased Jeana an airline ticket for a December 4 Massachusetts departure and a January 5 return. On November 28 Linda petitioned the Norfolk Division Probate and Family Court in Massachusetts for a temporary order. On the same day that court granted Linda temporary custody of Jeana and issued a temporary order asserting jurisdiction over Jeana for all matters "including, but not limited to custody, visitation and child support." The Massachusetts court set the matter for a December 12 hearing.

On December 2 Linda moved in the Alaska court to stay or vacate the November 22 order pending resolution of the jurisdictional issues between the Alaska and Massachusetts courts. Linda asked for expedited consideration due to the visit scheduled for December 4. Following a December 2 hearing, Judge Niesje J. Steinkruger, sitting in Judge Savell's absence, declined to stay or vacate the November 22 order. Linda did not allow the scheduled visit to occur.

On December 7 Linda filed a motion requesting that Alaska decline jurisdiction. On December 12 Judge Savell, without argument or written opposition from Robert, held that Alaska had jurisdiction, and ordered that visitation take place. Thereafter, Robert had visitation with Jeana in Alaska from December 15 to January 14. Robert moved for another month-long visit, and on March 30 the court ordered a second visitation "for a [three] week period to be chosen" by Robert.

Following a four-day trial in May and June, the court issued oral findings and conclusions awarding primary physical custody to Robert so long as the parties lived in separate communities, and shared physical custody if Linda moved back to Alaska. The superior court awarded Linda visitation in Alaska as "frequently as possible," and held that Linda should have at least two two-week periods of visitation in Massachusetts in the upcoming year, with each party bearing the cost of one visit.

The court's oral and written findings discredited Linda's credibility and completely rejected her testimony regarding domestic abuse, stalking, and her fear of Robert. The court found that Linda's actions in moving to Massachusetts would constitute custodial interference under *Strother v. State*, 891 P.2d 214 (Alaska App.1995), and that "[e]xcept for [Linda's] actions in interfering with [Robert's] relationship with Jeana, both parents have demonstrated the willingness to meet Jeana's physical, emotional, mental and religious needs." The court ordered Linda to pay $50 per month in child support, and denied her request for back child support because it concluded she had failed to meet her burden of proof under *Matthews v. Matthews*, 739 P.2d 1298, 1299 (Alaska 1987).

■ Linda appeals from the custody award and the denial of her claim for child support.[2]

## III. *DISCUSSION*

### A. *Standard of Review*

■ Trial courts are vested with broad discretion in making child custody determinations. *Gratrix v. Gratrix,* 652 P.2d 76, 79 (Alaska 1982). "We will reverse a trial court's resolution of custody issues only if [we are] convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous." *Id.* at 79–80 (citing *Horutz v. Horutz,* 560 P.2d 397, 399 (Alaska 1977)). We have held that

> while "great weight must be accorded to the trial judge's experience and to his evaluation of demeanor testimony," his discretion is not unlimited. On review we must determine whether that discretion has been abused, perhaps by assigning too great a weight to some factors while ignoring others, perhaps by elevating the interests of one of the parties to the dispute above that of the child, perhaps by making a clearly erroneous finding with respect to some material issue, or perhaps in some other manner.

*Id.* at 80 (quoting *Horton v. Horton,* 519 P.2d 1131, 1132 (Alaska 1974) (footnote omitted)). We review fact findings under the standard of clear error. *McDaniel v. McDaniel,* 829 P.2d 303, 305 (Alaska 1992). We apply our independent judgment to questions of law, adopting "the rule of law that is most persuasive in light of precedent, reason and policy." *Brooks v. Brooks,* 733 P.2d 1044, 1055 (Alaska 1987) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

### B. *Custody Award*

Linda argues that the custody award should be reversed because the superior court abused its discretion by relying on clearly erroneous factual findings that were critical to the court's award, by improperly weighing the statutory factors, and by being improperly motivated by a desire to punish Linda or to advocate for Robert at the expense of Jeana's best interests. Although we find that the superior court made several erroneous factual findings regarding Linda's credibility, we conclude that these errors were not prejudicial. We also conclude that the superior court was not biased against Linda. Nonetheless, we reverse the custody award because the court erroneously weighed the statutory factors.

#### 1. *Clearly erroneous factual findings*

■ Linda argues that the superior court clearly erred in making findings about her alcohol consumption, stalking allegations, Jeana's discipline, Robert's presence at home, and Robert's refusal to pay for day care, causing the superior court to erroneously assess her credibility. She asserts that these erroneous credibility assessments were critical "because [they] cast doubt in [the court's] mind that Linda left Alaska because she feared Robert and because [they] led [the court] to doubt Linda's future ability to foster Robert's relationship with Jeana despite her stated intentions."

The superior court explained the impact of its credibility findings in the following way:

> Credibility is very important in this case. The sad observation that a Court makes sometime[s] is that people who view the emotional involvement or the prize to be won in litigation is so overpowering or so weighty that, in their minds, they justify embellishments, fabrications even, and false testimony. It can be offered to place themselves in a good light or to place an opponent party in a bad light. Often times, and there are examples in this case, the issue which is less than candidly ex-

**2.** Linda lists a number of possible appellate issues in her statement of points on appeal. Her failure to provide substantive discussion or authority demonstrating error waives any argument the court erred in rendering the following rulings: (1) denying her jurisdiction motion and failing to require Robert to file an opposition to the motion; (2) denying her motion to dismiss; and (3) requiring that the parties split visitation costs. *Raris v. Greek Corner,* 911 P.2d 510, 511 n. 5 (Alaska 1996) (holding that when a party fails to cite any facts or case law in support of an assertion, the argument is waived). It is insufficient that she simply mentions these rulings in the context of other arguments.

plained to the Court, is not of critical materiality to the dispute and the Court is left with greater damage from the misleading statements and the effect it has on findings of credibility than if the truth had even been told because the stain of adverse findings of credibility, or the weakness resulting from eroded credibility, splashes on to other areas and weakens the integrity of other factual premises.

We conclude that the court did not clearly err with respect to its findings regarding Linda's disciplinary methods, Robert's presence at home when Linda and Jeana lived with Robert, and Robert's refusal to pay for day care.[3] Although we conclude that the court clearly erred in finding that Linda made false or misleading statements regarding her current alcohol consumption and her allegation that Robert stalked her,[4] these errors were harmless given the remaining findings bearing on Linda's credibility. In addition to the findings challenged by Linda, the superior court found Linda's credibility to be harmed by her statements regarding Angela Pugliese's allegations of sexual abuse, her silence in the face of Angela's testimony that they did cocaine together, her false statements made in day care assistance applications, and her reluctant admission of marijuana use. It is highly improbable that, but for the errors regarding Linda's alcohol consumption and stalking allegations, the superior court would have assessed Linda's credibility more favorably.

### 2. Consideration of statutory custody factors

When the custodial parent moves out of state, a court must consider whether it is in the child's best interests to remain with that parent, given the move. *McQuade v. McQuade*, 901 P.2d 421, 424 (Alaska 1995); *House v. House*, 779 P.2d 1204, 1208 (Alaska 1989). Alaska Statute 25.24.150(c) lists the factors to be considered in determining the child's best interests:

> The court shall determine custody in accordance with the best interests of the child under AS 25.20.060–25.20.130. In determining the best interests of the child the court shall consider
>
> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

3. The superior court did not explicitly find any false or inconsistent statements by Linda or her witnesses regarding Jeana's discipline. It merely noted that

> to cast herself in a good light, all of the people [who] were called and questioned about it, reached to explain that discipline [is] only time out. There wasn't an allegation that discipline techniques were inappropriate and, to a degree, it's understandable that these witnesses and parties try to cast themselves in a good light.

Thus, it appears that the court discussed this issue as an example of the tendency to be less than candid about an issue that "is not of critical materiality … [but as a result of which] the Court is left with greater damage from the … effect it has on findings of credibility." The superior court did not clearly err in making this observation.

We also find that the court did not clearly err in finding that Linda made false or misleading statements about Robert's presence at home or his asserted refusal to pay for day care.

4. The superior court found that Linda testified "that she had not had a drink since her DWI and that she can't drink, as her body rejects alcohol." The court also found that Linda's sister, Lorraine Pollard "verified that [Linda] continues to drink occasionally, a couple of wine coolers every couple of weeks." Our independent review of the record confirms Linda's argument that the actual testimony is not inconsistent and can be reconciled.

Linda also argues that the superior court erred in finding that her testimony regarding stalking was inconsistent. The court found that "[Linda] testified that she feared [Robert] because he was stalking her and that she left the state because of this stalking. She also testified that the stalking began only after she said she would leave." Although testimony regarding this issue was somewhat confusing, Linda's transcribed testimony establishes that the finding of inconsistency is clearly erroneous.

(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

Linda argues that the court improperly balanced these factors by placing "too great a weight on Linda's perceived inability to allow an open, frequent and loving relationship between Robert and Jeana and not enough weight on the continuity and stability of Jeana's placement."

The superior court considered all the statutory factors. It found that both parents "have the capability to meet the physical, emotional, mental and religious needs of Jeana" and that "[t]here is obvious, demonstrable love and affection between Jeana and both parents." Although it recognized that Jeana would have a stable, satisfactory life in Massachusetts, it discounted the stability and continuity factor "because it runs contrary to the statutory ... policies against parental kidnapping, forum shopping, the [Uniform Child Custody Jurisdiction Act] and the importance placed on having both parents in a child's life." The court announced that "[t]he key [determinative] factor" was Linda's "failure to allow an open and frequent relationship with [Robert] and the belief that she would not do so in the future." The court stated that "[t]his factor more than counterbalances the desirability of maintaining Jeana's stability with [Linda] in her new home, created only when she wrongfully fled with Jeana."

■ The superior court's conclusion that Linda engaged in wrongful conduct underlies its assessment of these statutory factors. It stated that she "wrongfully fled with Jeana." By referring to policies against "parental kidnapping," it implied that Linda violated those policies. Its finding that Linda would not allow an open and frequent relationship between Jeana and Robert appears to be founded, at least in part, on its conclusion that Linda's actions constituted "custodial interference" under *Strother v. State,* 891 P.2d 214 (Alaska App.1995).

These underlying conclusions are incorrect.

The record does not support a finding of custodial interference. In *Strother,* the court of appeals analyzed the custodial interference statute, AS 11.41.330, and examined the necessary actions and mental state for the crime of custodial interference. It held that custodial interference can occur in the absence of a court order establishing custody because natural parents are presumptively joint custodians with co-equal rights to the child. 891 P.2d at 218 n. 1, 223. It cautioned, however, that when the person accused of custodial interference is a joint custodian, "the actus reus of the crime must be examined with care." *Id.* at 223. To be guilty of custodial interference the defendant must commit the actus reus, "the act of taking, enticing, or keeping a child from a lawful custodian with 'no legal right to do so,'" with the necessary mental state, knowing that he or she has no legal right to take the child and intending to keep the child for a protracted period. *Id.* The *Strother* court noted that a joint custodian could legitimately take temporary exclusive custody of a child, even taking a child out of state, "because such an act generally does not deprive the other joint custodian of his or her custody rights." *Id.* at 224. "But if a parent takes custody of the child and exercises that custody in a manner that defeats the custody rights of the other parent, unlawfully 'keeping' the child from the other parent, then the parent's conduct constitutes the actus reus of custodial interference." *Id.* In holding that the necessary actus reus existed in *Strother,* the court of appeals found that the defendant had taken the child to another state, told the mother that she would never see him or their child again, and kept the child's whereabouts unknown from the mother. 891 P.2d at 217, 225.

When Linda left Alaska she returned to Massachusetts, where the parties had met,

where both parties had extended families, and where Linda had lived before moving to Alaska where she lived for a relatively short time. Linda went where Robert knew she would go, to the homes of her sister and her mother. Linda contacted Robert's family in Massachusetts and arranged day care for Jeana through Robert's sister-in-law. Soon after arriving in Massachusetts Linda called Robert and, although the conversations were not always amicable, the parties remained in contact. Linda allowed Robert to speak with Jeana. This is not a case where a parent went underground to conceal the child's location, violated a court custody order, or made threats that the noncustodial parent would never see the child again.[5] The superior court consequently erred in concluding that Linda's conduct constituted custodial interference.[6]

■ Similarly, the court also erred in characterizing Linda's conduct as wrongful and implying that Linda had violated policies against parental kidnapping.[7] These errors did not merely misclassify the nature of Linda's conduct, but appear to have been critical to the superior court's assessment of the statutory custody factors and its refusal to give full credit to the undisputed opinions of the custody investigators regarding stability and continuity.

■ We also conclude that it was clear error to find that Linda would in the future impede a healthy relationship between Jeana and Robert, a circumstance the court considered the key determinative factor in deciding custody. After the jurisdiction issue was settled, Linda complied with all of the court's orders and Robert had two lengthy visits with Jeana. Linda also testified that she believed it was important for Jeana to spend time with her father and it is uncontested that after Linda and Jeana moved out of Robert's Fairbanks home it was Linda who pursued and facilitated visitation between Jeana and her father. These facts are undisputed. Therefore, the court's unfavorable findings regarding Linda's credibility cannot justify its conclusion that Linda failed to foster a healthy relationship between Robert and Jeana. We conclude that the erroneous findings of wrongful conduct and custodial interference influenced and invalidated the superior court's conclusion that Linda had failed to foster a healthy relationship between Jeana and Robert and would continue to do so in the future.

■ Moreover, even if Linda had previously interfered with Robert's relationship with Jeana, a finding that she would continue to do so would be necessarily speculative given her recent record of compliance with court orders. It is an abuse of discretion to change custody based on such speculation when other, less severe, remedies are available to address any future misconduct, the stability and continuity factor strongly disfavors a custody change, and the remaining statutory factors are in balance. A custody change necessarily conflicts with stability and continuity. A less intrusive order requiring compliance with existing custody and visita-

---

5. When Linda left Alaska with Jeana in June 1994 she was Jeana's primary caregiver and violated no court order or custody agreement by taking Jeana to Massachusetts. Furthermore, Jeana's birth certificate did not list Robert as the father, nor had he been adjudicated a lawful custodian of Jeana. On the contrary, Linda asserts that Robert refused to have his name placed on the birth certificate. To have been guilty of custodial interference, Linda would have had to have known that she had no legal right to act as she did. The facts militate against the existence of such knowledge.

6. The decision is also deficient because it did not examine any of the statutory elements of custodial interference. Its conclusion recited no analysis, and was not supported with sufficiently detailed and explicit findings. See, e.g., Sloan v. Jefferson, 758 P.2d 81, 86 (Alaska 1988) ("A trial court's findings must be sufficiently detailed and explicit to give an appellate court a clear understanding of the ground on which the trial court reached its decision.").

7. The record does not support a finding of parental kidnapping. AS 11.41.300 codifies this crime; it is a statutory affirmative defense if the defendant is a relative of the victim, the victim is under 18 years of age, and the defendant's primary intention was to assume custody of the victim. AS 11.41.300(b). The most serious allegation against Linda potentially supportable by the record was that she took Jeana to Massachusetts because she wanted to get away from Robert and did not want any interference in raising Jeana. Such actions would not constitute parental kidnapping.

tion arrangements should have been attempted before changing Jeana's custody.

■ Moreover, in holding that Linda's past and future failure was the key determinative factor, the court discounted or rejected the opinions of the two custody investigators. They opined that Linda should remain Jeana's primary physical custodian. Both investigators concluded that Jeana was a well-cared-for child who was developing appropriately and that it was unwise to disrupt Jeana's life at this point with a change in custody from the person who had been her primary caregiver. No contrary expert opinion was offered. The superior court discounted the recommendation that it was desirable to maintain the continuity of Jeana's life in Massachusetts on the theory that "it runs contrary to the statutory ... policies against parental kidnapping, forum shopping, the UCCJA and the importance placed on having both parents in a child's life." Because the record does not support the superior court's legal conclusions regarding Linda's move to Massachusetts, the policy concerns mentioned by the superior court are unwarranted and are not a valid basis for discounting the experts' undisputed opinions about the important stability and continuity factor. Further, when there is a conflict between the stability and continuity factor (a factor that clearly favored Linda), and the factor regarding the custodial parent's desire and ability to allow an open and loving frequent relationship (a factor that potentially favored Robert), a change in custody should not be ordered until the court has explored less intrusive means of obtaining compliance unless it finds such means would be futile.

■ We recently considered the standards for determining custody of a minor child when one parent chooses to move out of state. We held that "a court must consider the best interests of the children by applying the criteria in AS 25.24.150(c), and in doing so should consider whether there is a legitimate reason for the move." *McQuade*, 901 P.2d at 424. In *McQuade*, we noted that Alaska has not adopted an anti-removal policy and that we have "consistently avoided mandating rigid rules for making custody determinations." *Id.* We concluded that the

standard announced in *House*, 779 P.2d at 1208, is the proper standard to apply when one parent is moving out of Alaska. *McQuade*, 901 P.2d at 424. In *House*, we noted that "[m]ost states permit custodial parents to move out of state with their children if there is a legitimate reason for the move." 779 P.2d at 1208 (citing 1 Jeff Atkinson, *Modern Child Custody Practice* § 7.01, at 390 (1986)). We concluded that the "decision of the family to move to [California] was based upon a valid reason, that is, a reason which was not primarily motivated by a desire to make visitation ... more difficult." *House*, 779 P.2d at 1208.

The evidence here does not establish an illegitimate motive. The motive element is not mentioned in AS 25.24.150(c); it most directly bears on the "frequent relationship" factor. Linda expressed mixed motives for the move at trial and to the investigators. The superior court found that Linda's stated reason for returning to Massachusetts—her fear of Robert—was unfounded, and that she "left Alaska because she decided that it would be easier to raise Jeana without[Robert's] interference."

■ We have rejected the court's characterization of Linda's actions as constituting custodial interference under *Strother*, and have concluded that the court erred in stating that Linda "wrongfully fled" to Massachusetts with Jeana. Linda's desire to be near her family and Robert's family, i.e., Jeana's maternal and paternal grandparents, is sufficient reason to justify her relocation and to conclude that it would be in the child's best interests to remain in the custody of the present custodial parent. A desire to live distant from the estranged partner is not remarkable. Certainly under the circumstances of this case, given the family presence in Massachusetts and Linda's and Jeana's shallow Alaska roots, it is not the sort of illegitimate reason that should become the controlling factor, justifying rejection of the stability and continuity factor. Further, the high probability Robert will be able to exercise appropriate visitation rights minimizes judicial concern about mixed motives (both valid and illegitimate reasons) for a move.

We note with approval the recent California Supreme Court case of *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473, 481 n. 5 (1996), where the court explained that "[o]nce the trial court determined that the mother did not relocate in order to frustrate the father's contact with the minor children, but did so for sound 'good faith' reasons, it was not required to inquire further into the wisdom of her inherently subjective decisionmaking." As the California Supreme Court stated,

> [O]urs is an increasingly mobile society. Amici curiae point out that approximately one American in five changes residences each year. Economic necessity and remarriage account for the bulk of relocations. Because of the ordinary needs for *both* parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so. It would also undermine the interest in minimizing costly litigation over custody and require the trial courts to "micromanage" family decisionmaking by second-guessing reasons for everyday decisions about career and family.

*Id.* 51 Cal.Rptr.2d at 451–52, 913 P.2d at 480–81.

We noted in *McQuade,* and emphasize here, that when a custodial parent decides to move out of Alaska, the best interests of the child must be determined "based upon the facts and circumstances of each particular case." 901 P.2d at 424.

Setting aside the erroneous conclusion that Linda would not foster an open and healthy relationship between Jeana and Robert, the statutory best interest factors did not justify awarding custody to Robert. Linda was Jeana's primary caregiver and her sole custodian (apart from visitation) after the parties sepa-

rated. Given the undisputed opinions of the two custody investigators in Alaska and Massachusetts that, in the interests of continuity and stability, Jeana should remain with Linda, it was an abuse of discretion to change the status quo and award custody to Robert.

Because the trial court made a legal error in discounting the continuity and stability factor, we reverse the order granting custody to Robert and direct the trial court to enter an order granting custody to Linda. We do not remand for reconsideration because we conclude, as a matter of law, that the continuity and stability factor controls the result of this case. That factor compels the conclusion that Linda be awarded custody.

### 3. *Sua sponte evidentiary objections*

█ Linda asserts that the superior court improperly took on the role of advocate for Robert at trial, elevating Robert's interests and the trial judge's desire to punish Linda above Jeana's best interests by making *sua sponte* evidentiary "objections" and advocating for Robert on five occasions. Although we have already reversed the custody determination with instructions that Jeana's custody be awarded to Linda, we reach this issue because Linda suggests that these rulings reflect lack of impartiality and because on remand the court may have to make additional discretionary rulings.

We conclude that these rulings were permissible and reveal no partiality or bias. Three of these incidents involved hearsay issues. The court excluded testimony in only one of these three incidents. The fourth incident involved a *sua sponte* ruling that questioning by Linda's counsel was argumentative.[8] Linda provides no record citation for the fifth incident, where the superior court ruled against the presentation of privileged testimony. Linda consequently waives this issue. *Raris v. Greek Corner,* 911 P.2d 510, 511 n. 5 (Alaska 1996); Alaska R.App.P. 212(c)(8)[c].

---

8. In reference to an incident in which Jeana used bad language, Linda's counsel asked Connie Pugliese whether it was correct that Jeana had been with her father the month prior to the incident. Pugliese responded that Jeana had been with her mother. When Linda's counsel responded "Yeah, but she had been with Bob," Judge Savell interrupted by stating "Argument, counsel. Ask your next question."

■ It is not an abuse of discretion for a judge to make *sua sponte* evidentiary rulings under certain circumstances. 1 John W. Strong, *McCormick on Evidence* § 55, at 224 (4th ed. 1992) ("[T]he failure by the party does not of itself preclude the trial judge from excluding the evidence on his own motion if the witness is disqualified for want of capacity or the evidence is incompetent, and he considers that the interests of justice require the exclusion of the testimony."). However, "[i]t is only when the evidence is irrelevant, unreliable, misleading, or prejudicial, as well as inadmissible, that the judge should exercise his discretionary power to intervene." *Id.* at 225. A judge should not intervene if the evidence is reliable and valuable and is only inadmissible due to technical exclusionary rules or a privilege protection. *Id.* Hearsay objections go to the competence of the evidence, are not mere technical exclusions, and therefore are within the discretionary power of the judge to exclude if justice requires. *See id.* at 224 n. 20 (citing a hearsay exclusion in support of the rule that judges may exclude evidence absent an objection). Additionally, ruling that Linda's counsel's question was argumentative is not an abuse of discretion, but is a permissible exercise of judicial power "to control the presentation of evidence so as 'to make the interrogation and presentation effective for the ascertainment of truth.'" *Id.* at 225 n. 21 (quoting Fed.R.Evid. 611(a)); Alaska R.Evid. 611(a), commentary at 513 (stating that the subsection (a) of the state rule mirrors the federal rule). The superior court did not abuse its discretion in making *sua sponte* evidentiary rulings.

Linda argues that the rulings evidenced the superior court's improper advocacy for Robert. The rulings however were well founded and the superior court explained that it could allow the hearsay testimony and then find that Linda had produced no evidence, but it would "rather not proceed that way." In this respect, the superior court attempted to help Linda, arguably at Robert's expense. Linda presents no evidence to substantiate her allegation that the superior court was motivated by a desire to punish her. Her argument that that was how it appeared and that the "punishment was evi-dent in [the superior court's] advocacy for Robert at trial" is not as self-evident as Linda suggests. Because a proper purpose can be readily discerned in these rulings, we find no abuse of discretion and reject Linda's claim that the superior court improperly advocated for Robert or punished Linda.

### C. *Past Child Support*

■ Linda argues that the superior court should have ordered Robert to reimburse her for past child support and should have applied Alaska Civil Rule 90.3 to calculate the amount due. The superior court, holding that *Matthews v. Matthews,* 739 P.2d 1298 (Alaska 1987), governed Linda's claim, altogether denied past child support because Linda failed to meet her burden of proving actual expenses incurred.

Although we instructed the trial court in *Matthews* to determine the actual amount the custodial parent reasonably expended and to equitably allocate this amount between the parents, 739 P.2d at 1299, our ruling there is not determinative of the issue now presented because we were not asked in *Matthews* to decide whether newly-enacted Rule 90.3 governed the issue. We now reach the issue for the first time.

Application of Rule 90.3 has the advantage of simplicity and consistency. It is desirable to have a consistent rule regarding support obligations so that potential liabilities can be calculated with some certainty. *See, e.g.,* Alaska R.Civ.P. 90.3, Commentary I.B. ("Predictable and consistent child support awards will encourage the parties to settle disputes amicably and, if resolution by the court is required, will make this process simpler and less expensive."). Requiring proof of actual costs can lead to prolonged disputes when the interests of custodial parents in maximizing support may encourage deception and the interests of non-custodial parents in minimizing support may disadvantage the children. Rule 90.3 itself is relatively well-defined. Its standards are well-known to the trial courts, and reported appellate decisions interpret it. Attempts to calculate actual out-of-pocket expenses are not only difficult, but are also likely to underestimate

incremental costs attributable to support. Therefore, we hold that absent extraordinary circumstances, courts should apply the calculation methodology of Rule 90.3 to determine amounts to be reimbursed to custodial parents for support of children during periods not covered by support orders.

We note that this use of the Rule 90.3 standards does not violate the prohibition of Rule 90.3(h)(2) [9] against retroactive modification of arrearages. There was no existing child support order for the period for which Linda sought reimbursement. Consequently, applying Rule 90.3 under these circumstances does not modify any existing arrearage. Given our conclusion that the superior court should have applied Rule 90.3, and the absence of any dispute that Linda was Jeana's custodian, it is necessary to reverse the denial of past child support.

## IV. CONCLUSION

We REVERSE the custody determination and REMAND for entry of an order granting primary physical custody to Linda and for further proceedings to set appropriate visitation rights for Robert. We REVERSE the issue of reimbursement for past child support and REMAND for calculation under Rule 90.3.

COMPTON, Chief Justice, dissenting.

I dissented from the August 6, 1996 Order reversing the custody award and remanding the case with instructions that an order awarding custody to Ms. Vachon be entered. I expressed the following view:

I would affirm the judgment of the superior court. The court considered all relevant statutory criteria in determining custody, including: (1) Ms. Vachon's stated reasons for her unannounced departure from Alaska with the couple's child, which it found pretextual and not credible; (2) the stability of the child's environment—gained at the expense of Ms. Vachon's pretextual departure from Alaska, relocation in Massachusetts, and resulting denial of Mr. Pugliese's regular visitation and contact with the child in Fairbanks, where

she had lived since birth—balanced against the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent, which it found utterly lacking in Ms. Vachon; and (3) the importance of enforcing statutory policies against parental kidnapping, forum shopping, and the Uniform Child Custody Jurisdiction Act. It concluded that "the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent," AS 25.24.150(c)(6), was the "key determinative factor" in awarding custody to Mr. Pugliese. If the superior court applied an incorrect legal standard, a proposition with which I would not agree, the remedy should be to remand the case to that court with directions that it apply the correct legal standard. If the superior court [arguably] abused its discretion, the standard which I believe should be applied [to this case], I find Ms. Vachon's argument devoid of merit.

I have reviewed the court's "written discussion of its reasons for granting the relief" requested by Ms. Vachon. The reasons are not now more persuasive than before they were reduced to writing. The message conveyed by this case is both clear and disturbing: if the self-appointed child custodian can remove the child from the state and keep the child away long enough, even if the self-appointed custodian must return for an eventual trial on the custody issue, the statutorily articulated preference for having custody decisions made in the "home state" loses any value. Highlighting this point is the fact that the court has embarked upon a judicial prioritization of the statutory criteria found in AS 25.24.150(c), a policy it has never before endorsed. The court holds that if there is a conflict between §§ 150(c)(5) and (6), "a change in custody should not be ordered until the court has explored less intrusive means of obtaining compliance unless it finds such means would be futile.... [W]e conclude, as a matter of law, that the continuity and stability factor controls the result of this case." Maj. Op. at 380, 381. The mischief

9. In relevant part, this provision states that "[c]hild support arrearage may not be modified retroactively, except as allowed by AS 25.27.166(d)." Alaska R.Civ.P. 90.3(h)(2).

this prioritization will lead to cannot be minimized. It should not be ignored.

It was only *after* Ms. Vachon lost on the jurisdictional issue that she began to comply with Alaska court orders. By that time she had kept the child away from the "home state" for at least six months. She had reestablished family relationships, and had begun creating a new "stable environment" for the child.

By the time of trial it becomes of little consequence where the trial is held. The policies which the superior court concluded were important, *i.e.* policies regarding parental kidnapping, forum shopping, and principles relating to uniform child custody jurisdiction, apparently are not worthy of judicial enforcement. Even though the court ably distinguishes this case from the criminal proceeding at issue in *Strother v. State*, 891 P.2d 214 (Alaska App.1995), the policies underlying all are the same. The superior court's findings regarding Ms. Vachon's violation of those policies are not clearly erroneous, apparently only irrelevant.