**Trene ELLIOTT, Appellant,**

v.

**Ronald L. SETTJE, Appellee.**

No. S–9688.

Supreme Court of Alaska.

July 27, 2001.

---

W. Clark Stump, Stump & Stump, Ketchikan, and Joshua Rosen, Attorney at Law, Los Angeles, for Appellant.

Michael W. Holman, Holman & Schulz, Ketchikan, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

### I. INTRODUCTION

Trene Elliott appeals the superior court's ruling to grant Ronald Settje joint physical custody of their two-year-old daughter Kessa according to a schedule that alternates custody every two to three days. Because the trial court did not abuse its discretion in awarding joint physical custody or in devising a custody schedule to minimize the time Kessa is separated from each parent, we affirm.

### II. FACTS AND PROCEEDINGS

Kessa Elliott is the daughter of Trene Elliott and Ronald Settje. Kessa was born on February 5, 1999. She is a happy and well-adjusted child, described by the guardian ad litem as a "very happy little girl": "wanting to do whatever she can," playing well with her step-brothers and cousins, and "[a]lways giving kisses when asked."

Elliott and Settje were never married to each other. Both Elliott and Settje work for the City of Ketchikan. When their relationship began, Settje supervised Elliott.

Prior to Settje's relationship with Elliott, he had an eight-year live-in relationship with Nora Bain. At some point, Settje and Bain worked out their differences. They married in November 1998.

In March 1999 Settje filed this action for paternity testing and shared custody. Once paternity was proven, Settje began visitation with Kessa under Elliott's supervision. Because Elliott would not allow Settje to have unsupervised visitation, Settje moved for an interim visitation order. Superior Court Judge Thomas M. Jahnke granted Settje's motion for eleven hours of unsupervised visitation per week. Several months later, Settje moved to expand the interim visitation order because Elliott would not allow Kessa to stay overnight in his home. Again, Judge

Jahnke granted Settje's motion for overnight visitation on alternate weekends.

Judge Jahnke also granted Elliott's unopposed motion to appoint a guardian ad litem (GAL). The GAL's report noted the parties' differing preferences for visitation as of March 2000. Although complying with the court order, Elliott still opposed overnight visits, believing Kessa to be too young. Elliott, however, did indicate that the court-ordered overnight visitation "seemed to be going pretty good" at the time of the GAL's investigation. Settje generally liked the visitation schedule but wanted to add another overnight visit and to be able to pick up Kessa directly from daycare for his weekday visits to reduce the amount of travel time during his visitation hours. The GAL recommended extending Settje's visitation according to his two requests and leaving "actual physical custody" with Elliott.

After trial in April 2000, Judge Jahnke found that both Elliott and Settje were "excellent parents" who "appear to be able to work toward a relationship that will allow each to foster an open and loving frequent relationship between Kessa and the other parent." He concluded that an ultimate goal of equal custody should be achieved at some point.

Judge Jahnke weighed the custody factors of AS 25.24.150(c) and determined that Elliott had a slight advantage due to her role as Kessa's primary care giver up to this point but that Settje would "catch up quickly." He also recognized an additional significant factor—Kessa's very young age and "the opportunity to build strong bonds with *each* parent if reasonable custodial periods with each parent [could] be assured." Judge Jahnke agreed with Elliott that any lengthy separation from her was not advisable but noted that he was unaware of any research showing harm in short-term separations. He devised a custody schedule "to balance the need for meaningful contact with each parent while avoiding any anxiety on the part of the child that the other parent has abandoned her."

The schedule reached equal physical custody in two steps. For the remainder of 2000, the schedule changed custody every two to three days, increased Settje's time with Kessa from thirty-nine hours every two weeks to six days every two weeks, and provided that Kessa would be separated from Elliott no more than forty-eight hours at a time and from Settje no more than seventy-two hours at a time. The second step achieved equal custody starting in 2001 and provided that Kessa be separated from either parent for no more than seventy-two hours at a time. Judge Jahnke further noted that the parties could agree to less frequent changes in custody as Kessa grew older.

Elliott appeals the superior court's custody schedule as an abuse of discretion. She does not contest the superior court's factual findings.

## III. STANDARD OF REVIEW

The trial court has broad discretion to determine child custody issues.[1] We review a trial court's resolution of custody issues for abuse of discretion.[2] "Abuse of discretion is established if the trial court considered improper factors or failed to consider statutorily-mandated factors, or improperly weighted certain factors in making its determination."[3]

## IV. DISCUSSION

Elliott argues that the superior court abused its discretion in two ways: by granting joint physical custody and by imposing a custody schedule that minimizes the time Kessa is separated from each parent but requires frequent exchanges of custody.

### A. The Superior Court Did Not Abuse Its Discretion by Granting Joint Physical Custody.

Elliott argues that the custody factors should favor awarding her primary physical

**1.** *See Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000) (citing *Valentino v. Cote*, 3 P.3d 337, 339 (Alaska 2000)).

**2.** *See B.B. v. D.D*, 18 P.3d 1210, 1212 (Alaska 2001); *Platz v. Aramburo*, 17 P.3d 65, 68 (Alaska 2001).

**3.** *McQuade v. McQuade*, 901 P.2d 421, 424 n. 9 (Alaska 1995) (quoting *Gratrix v. Gratrix*, 652 P.2d 76, 80 (Alaska 1982)).

custody. She contends that the superior court abused its discretion by not making the "stability and continuity" factor decisive in this case where the other factors were relatively balanced. She also contends that the superior court abused its discretion in failing to give the GAL's report sufficient weight.

### 1. *The "stability and continuity" factor*

Elliott contends that the "stability and continuity" factor has special weight to "tip the balance" when the other factors are relatively equal. Settje responds that the case law does not support Elliott's contention and that the factors favored granting joint physical custody.

Alaska Statute 25.24.150(c) lists the factors that the court must consider in determining the best interests of a child.[4] The "stability and continuity" factor focuses on "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity."[5] In analyzing the "stability and continuity" factor, we have approved of two approaches: an assessment of the parents' relative stability, and a broader inquiry of the children's more general need for stability in their overall living environment.[6] As then-Chief Justice Rabinowitz noted, "[s]tability is often a function of parental attitude."[7] We have also noted that the "stability and continuity" factor does not automatically give a custodial preference to the primary care giver.[8]

Elliott cites *Evans v. Evans*[9] and *Vachon v. Pugliese*[10] to support her contention that the "stability and continuity" factor has some special weight when the other factors are equally balanced. But *Evans*'s holding does not go so far, and both cases are factually distinct from the instant case. *Evans* concluded only that the trial court did not abuse its discretion when it found the statutory factors closely balanced but granted physical custody to the father because the children would have the additional stability of remaining in the familial home and of avoiding the potential stress of adjusting to a family situation with two other children.[11] We noted that the trial court's decision appeared "to have been based on case-specific evidence demonstrating [the children's] actual need for physical and emotional continuity and

---

4. AS 25.24.150(c) provides the factors for determining the best interests of a child in a custody dispute:

The court shall determine custody in accordance with the best interests of the child under AS 25.20.060—25.20.130. In determining the best interests of the child the court shall consider

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

5. AS 25.24.150(c)(5).

6. *See McQuade*, 901 P.2d at 426 (citing *Craig v. McBride*, 639 P.2d 303, 305 (Alaska 1982) and *Evans v. Evans*, 869 P.2d 478, 482–83 (Alaska 1994)).

7. *Craig*, 639 P.2d at 308 (Rabinowitz, C.J., concurring).

8. *See Evans*, 869 P.2d at 483 n. 4 ("We have never adopted a rule giving custodial preference to the primary care giver."); *I.J.D. v. D.R.D.*, 961 P.2d 425, 430 (Alaska 1998) ("[A mother's] argument that [a child] should remain with her simply because of her status as primary care giver lacks merit."); *McDanold v. McDanold*, 718 P.2d 467, 470 n. 4 (Alaska 1986) ("[T]he custodial parent will not be given presumptive preference at the actual custody disposition.").

9. 869 P.2d 478 (Alaska 1994).

10. 931 P.2d 371 (Alaska 1996).

11. *See Evans*, 869 P.2d at 479, 483.

stability in their overall living situation."[12] Our decision in *Evans* allowed the trial court substantial discretion to analyze the stability and continuity factor and other non-statutory factors related to stability, but it did not require giving the stability and continuity factor special weight when the other factors are equal.[13]

In addition, *Evans* is factually distinguishable because of the age of the children and the evidence of their "actual need for physical and emotional continuity and stability."[14] The Evans children were seven and twelve years old, and parental bonding was not mentioned as a concern.[15] Here, Kessa is only two years old, and the court expressly noted the concern of allowing her to bond with each parent. And in *Evans*, the custody investigator and a school counselor gave testimony of the children's actual need for physical and emotional security.[16] Here, the GAL made no express comment about Kessa's actual need for stability.

Similarly, *Vachon* is too factually disparate to be applicable here. Elliott's admission that *Vachon* is "somewhat factually inapposite" is an understatement. In *Vachon*, the mother moved from Alaska to Massachusetts with her child without notifying the father.[17] Custody investigators in both states recommended "that, in the interests of continuity and stability, [the child] should remain with [the mother]."[18] The trial court awarded primary physical custody to the father based on its findings that the mother's actions constituted custodial interference. We reversed because the mother's actions did not amount to custodial interference and because the trial court rejected the opinion of two custody investigators.[19]

None of these critical facts is present in this case. Here, both parents reside in Ketchikan, and there was no allegation of custodial interference. Also, the GAL made no special recommendation in the interest of continuity and stability. Finally, the trial court did not award Settje primary physical custody; it only decided to award joint physical custody. Because the cases are so factually disparate, *Vachon* is inapplicable.

In an attempt to make *Vachon* seem closer factually, Elliott speculates that the superior court was punishing her because she had an advantage in the two statutory factors concerning Kessa's physical, emotional, mental, religious, and social needs by being her primary care giver and because Elliott's mother argued with Settje during a pretrial visitation exchange. While Elliott is correct that punishment is not an appropriate consideration in making child custody determinations,[20] she presents no evidence to substantiate her allegations. Regarding the trial court's mention of Elliott's "head start" in caring for Kessa, the court stated,

> The first two statutory factors, concerning the physical, emotional, mental, religious, and social needs of the child, currently favor Trene Elliott by reason of the fact that she has gotten a head start on care giving during the pendency of this case. It is clear that Ron Settje will catch up quickly, especially with the capable and loving assistance of his new wife.

With this language, the trial court merely explained why these factors slightly favored Elliott; the court in no way implied that it was punishing Elliott. Regarding the trial court's negative comment on the argument between Elliott's mother and Settje, the court stated that Elliott's mother "thr[e]w

---

12. *Id.* at 483.

13. *See id.* at 482.

14. *Id.* at 483.

15. *See id.* at 479.

16. *See id.* at 483 & n. 3.

17. *Vachon*, 931 P.2d at 374.

18. *Id.* at 380.

19. *See id.* at 377–80.

20. *See id.* at 378 (noting that even if mother had previously wrongfully interfered with custody, to change custody on speculation that mother would do so in the future was an abuse of discretion); *see also Hakas v. Bergenthal*, 843 P.2d 642, 644 n. 3 (Alaska 1992) (citing several out-of-state cases holding that the well-being of the child, and not punishment of a parent, is the proper focus of a custody determination).

gasoline on the fire" but immediately followed with "I know she didn't mean it." The court then noted that Settje shared the blame, stating that "it wouldn't surprise me if [Settje] did over-react, notwithstanding his testimony to the contrary." In context, Judge Jahnke's comments are even-handed and appeared to be trying to dispel any remaining ill will resulting from the encounter between Elliott's mother and Settje.

Also, an equal sharing of custody for two equally fit parents can hardly be construed as punishment. If the trial court had changed primary physical custody from Elliott to Settje without other justification, that fact would better support the argument that the court's ruling was a punishment. But that did not happen. Here, the superior court found that both parents were excellent and could work together to raise the child. Its decision to grant joint physical custody was not an abuse of discretion.

### 2. The guardian ad litem's report and testimony

Elliott also argues that the superior court ignored the GAL's report and contends that a GAL's recommendation should not be lightly ignored. Settje responds that the trial court's decision was consistent with the GAL's testimony at trial.

 "The superior court is not required to follow the GAL's recommendation" so long as "the superior court's reasons for rejecting the custody investigation are not clearly erroneous." [21] A GAL's recommendation may support a trial court's custody decision,[22] and the undisputed opinions of two independent custody investigators may be given additional weight in some cases.[23] In this case, although the trial judge did not adopt the GAL's recommendation, the judge's ruling was not inconsistent with the GAL's report and testimony at trial.

Elliott is technically correct that the GAL's report stated that Elliott should retain "actual physical custody." But according to the

GAL's report, Settje did not ask for equal shared physical custody at the time; rather, because Settje was fairly satisfied with the court's interim visitation order, he asked only for an additional overnight visit and to be able to pick up Kessa directly from daycare for his weekday visits. The GAL's report noted Elliott's preference to stop overnight visits because she thought that Kessa was too young, but recommended that the court grant Settje's two visitation requests.

Because the GAL is unlikely to recommend more visitation than a parent requests, the GAL's recommendation to allow Elliott to retain actual physical custody does not equate to a recommendation to deny Settje equal physical custody. Instead, the GAL faced a choice between Settje's and Elliott's conflicting requests on visitation, which the GAL decided in Settje's favor. To the extent that the report recommendation has any bearing on whether joint physical custody was appropriate, the outcome of the report favoring Settje and the note that Elliott and Settje "should be able to communicate and discuss [parenting] matters" could be interpreted to support an award of joint physical custody at least as reasonably as Elliott's interpretation that the GAL actually recommended her primary physical custody over joint physical custody.

 Furthermore, the GAL testified at trial that both Elliott and Settje were good parents and that she had no concerns about either of their respective abilities to parent Kessa. The GAL also indicated that she had no reason to believe that equally shared physical custody would be detrimental to Kessa. Although the GAL never expressly recommended equal physical custody of Kessa, awarding Settje equal physical custody did not conflict with the GAL's recommendation to grant Settje's requests for additional visitation and was consistent with the GAL's testimony at trial. Thus, the trial court did not abuse its discretion in its use of the GAL's report and testimony.

**21.** *Rooney v. Rooney,* 914 P.2d 212, 219 (Alaska 1996).

**22.** *See Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1189 (Alaska 1987).

**23.** *See Vachon,* 931 P.2d at 380.

### B. The Superior Court Did Not Abuse Its Discretion by Imposing a Custody Schedule that Minimizes the Time Kessa Is Separated from Each Parent but Requires Frequent Exchanges of Custody.

Elliott also argues that the trial court's custody schedule essentially makes Kessa "into a 'ping-pong' ball with custody changing hands ... every two to three days." Elliott quotes extensively and selectively from a recent book [24] to support her argument that a child needs a primary care giver.[25] Settje responds that the legislature has indicated a preference for joint custody and that AS 25.20.060(c) gives a trial court the authority to impose a custody schedule with frequent and continuing contact with each parent. Elliott replies that the legislative preference for joint custody is limited to joint legal custody and indicates no preference for joint physical custody.

Although Elliott is correct that this court has previously acknowledged the legislative preference only for joint legal custody, and not joint physical custody,[26] AS 25.20.060(c) does grant a superior court the authority to award joint physical custody: "The court may award shared custody to both parents if shared custody is determined by the court to be in the best interests of the child. An award of shared custody shall assure that the child has frequent and continuing contact with each parent to the maximum extent possible." [27] Thus, if the trial court concludes that shared custody is in the child's best interests, a custody schedule with "frequent and continuing contact with each parent to the maximum extent possible" is required.

The superior court addressed the statutory factors, found them fairly equally balanced, and looked at the additional factor of Kessa's "very young" age and "the opportunity to build strong bonds with *each* parent." The trial court found that "[b]oth parents appear to be able to work toward a relationship that will allow each to foster an open and loving frequent relationship between Kessa and the other parent." By considering Kessa's age and the opportunity to build strong bonds with each parent as an additional "best interests" factor,[28] the trial court implied a finding that it was in Kessa's best interests to have two active parents. In developing the custody schedule, the trial court "balance[d] the need for meaningful contact with each parent while avoiding any anxiety on the part of the child that the other parent has abandoned her." Because the GAL did not believe that equally shared custody would be detrimental to Kessa and because Elliott provided no evidence that short-term separation from a parent would be detrimental (either generally or specifically regarding Kessa),[29] the trial

---

24. Mary Ann Mason, *The Custody Wars—Why Children Are Losing the Custody Battle and What We Can do About It* 63, 87–89, 91–92 (1999).

25. Elliott's selective excerpt contains no references to actual studies or other clinical evidence. For some similarly unsupported examples of the opposite view, *see* Vanessa H. White, *The Role of Development in Determining Children's Needs in Divorce in Child Custody and Time Sharing in Alaska* 7 (1997) ("The optimal time for parent/child bonding appears to be from about 18 months to three years of age. By the same token, toddlers of this age live very much in the present.... Because of this fact, a toddler requires frequent contact with both parents if he or she is to develop a strong bond with each of them. Contact should be frequent, and of limited duration. If shared custody is the goal, the custodial periods with each parent should be short. The child should have significant contact with each parent at least every two or three days."); *see also* Children's Rights Council, *Contact Schedule* (visited May 22, 2001) <http://www.gocrc.com/research/schedule.html>

(recommending no more than two days without seeing each parent for children ages two to five).

26. *See Ulsher v. Ulsher*, 867 P.2d 819, 823 n. 6 (Alaska 1994).

27. AS 25.20.060(c).

28. The final factor in AS 25.24.150(c) gives a court discretion to consider "other factors that the court considers pertinent." AS 25.24.150(c)(9).

29. Elliott does offer a hypothetical harm of the joint physical custody schedule. If Kessa misbehaves shortly before custody is transferred from Elliott to Settje, Kessa may feel that banishment is part of her punishment. The argument proves too much. The scenario could still occur under the court's interim custody order or the GAL's recommended custody schedule. Under the interim schedule for example, if Kessa is disciplined by Settje during a brief weekday visit, Kessa may feel that part of her punishment is

court decided that strong bonds with both parents outweighed the possibility of anxiety caused by frequent changes in custody. The trial court did not abuse its discretion.

In effect, Elliott invites us to choose a side in a continuing dispute over whether primary physical custody by one parent is generally better than joint physical custody by both parents. However, this court's role is to review the superior court's decision for an abuse of discretion according to the facts of this particular case. The legislature is charged with the general policy decision concerning a preference for joint physical custody. Indeed, some states' legislatures have done just that.[30]

In the end, cooperation between Elliott and Settje in raising Kessa will undoubtedly have a far more profound effect on Kessa's development than the details of the custody schedule. The superior court decided that they could put aside their differences and ensure that Kessa enjoys the full measure of the benefit of having two active, excellent parents. It was not an abuse of discretion to do so.

## V. CONCLUSION

Because the trial court did not abuse its discretion in determining that joint physical custody with minimal time separated from each parent was in Kessa's best interests, we AFFIRM.

---

banishment from Settje for the next few days. Adopting an equal physical custody schedule would require both parents to share equally the burden of reassuring Kessa that separation from the other parent is never a punishment.

**30.** Other states have enacted statutory presumptions or preferences for joint legal or physical custody. Wisconsin has the clearest preference for joint physical custody:

> The court shall set a placement schedule that allows the child to have regularly occurring, meaningful periods of physical placement with each parent and that maximizes the amount of time the child may spend with each parent, taking into account geographic separation and accommodations for different households.

Wis. Stat. Ann. § 767.24(4)(a)2 (West 2001). Some states require that both parents agree to a schedule that frequently alternates custody. *See, e.g.,* Wash. Rev.Code Ann. § 26.09.187(3)(b) (West 2000).